UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
BARBARA TOMLINS,

                              Plaintiff,


            - against -                          **OPINION AND ORDER**


VILLAGE OF WAPPINGER FALLS ZONING BOARD OF            No. 08-CV-9813 (CS)
APPEALS, and JOHN F. FENTON, individually,


                              Defendants.
-----------------------------------------------------------------------x

Appearances:

Michael H. Sussman
Sussman & Watkins
Goshen, New York
*Counsel for Plaintiff*

Michael J. Murphy
Luke C. Davignon
Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C.
Albany, New York
*Counsel for Defendants*

Seibel, J.

       Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 27.)

**I.       BACKGROUND**

       The following facts are undisputed except where noted.  Plaintiff Barbara Tomlins owns

a house in the Village of Wappingers Falls (the "Village"), in Dutchess County, New York,[1]

---

[1]        Although the caption identifies the village as "Wappinger Falls," the exhibits submitted
in connection with the instant motion make clear that the village is instead called "Wappingers
Falls," and I refer to it as such herein.

(Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1),[2] in which for many years she resided and operated a day care facility, (Pl.'s 56.1 ¶¶ 12–15).  From 1975 through 1988, Plaintiff obtained building permits to make various alterations to the house that resulted in a larger geographic footprint.  (*Id.* ¶ 11.) Since 1988, however, the house's footprint has remained constant.  (*Id.*)

In June 2004, Plaintiff obtained a building permit to expand the house vertically and to add the necessary accompanying plumbing and electrical fixtures.  (*Id.* ¶ 18; *see* Sussman Aff. Ex. 1.)[3]  Shortly after construction began, a neighbor appealed the issuance of the building permit to Defendant Village of Wappingers Falls Zoning Board of Appeals (the "ZBA"), and in July 2004 the building inspector ordered Plaintiff to cease and desist ongoing construction pending the ZBA's decision on the appeal.  (Pl.'s 56.1 ¶ 19.)  While awaiting the appeal, the unprotected structure flooded with rainwater, prompting the village to deem the house unsafe to inhabit.  (*Id.* ¶¶ 23–24.)  After making necessary fortifications, however, Plaintiff was permitted

---

[2]    "Defs.' 56.1" refers to Defendants' Statement of Undisputed Material Facts.  (Doc. 27-37.)  "Pl.'s 56.1" refers to Plaintiff's Reply to Defendants' Rule 56.1 Statement and Counter-Statement.  (Doc. 29-87.)  Plaintiff's Rule 56.1 submission is defective for failure to comply with this Court's individual practices in that it fails to reproduce each entry in Defendants' Rule 56.1 Statement before setting out its response thereto.  *See* Individual Practice 2(C)(i).

Defendants have not submitted a reply to Plaintiff's Rule 56.1 submission and instead attack several facts contained therein in their Reply Memorandum.  (*See* Reply Memorandum of Law ("Defs.' Reply Mem."), (Doc. 30), at 1–3.)  In considering the facts of this case, and for the purposes of adjudicating Defendants' motion, I consider any facts averred in Plaintiff's Rule 56.1 submission that are supported by the record and not specifically and expressly controverted by properly supported statements in Defendants' Reply Memorandum to be admitted by Defendants.  I decline to consider any of Plaintiff's averments that are not supported by, or that are contradicted by, admissible evidence in the record, (*see, e.g.*, Pl.'s 56.1 ¶¶ 32, 101, 103–04, 113, 116–17, 144), or that are legal arguments under the guise of undisputed facts, (*see, e.g.*, *id.* ¶¶ 49, 93).  *See Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 448 n.5 (S.D.N.Y. 2005) (citing Local Civil Rule 56.1(d)).

[3]    "Sussman Aff." refers to the Affirmation of Michael H. Sussman, submitted in opposition to Defendants' motion for summary judgment.  (Doc. 29.)

to re-inhabit the house.  (*Id.* ¶¶ 25–30.)  In October 2004, the ZBA heard the appeal and decided

to revoke not only the building permit but also the certificate of occupancy for Plaintiff's house.

(*Id.* ¶¶ 34–37.)  Plaintiff thereafter vacated the house and began living with her daughter.  (*Id.* ¶

43.)  Plaintiff commenced a proceeding under N.Y. C.P.L.R. Article 78 in the Dutchess County

Supreme Court for an order vacating the ZBA's October 2004 decision, and in March 2005 the

court upheld the ZBA's revocation of the building permit and directed Plaintiff to obtain a new

permit to complete construction, but vacated the ZBA's revocation of the certificate of

occupancy as "arbitrary and capricious."  (*Id.* ¶¶ 44, 46; *see* Sussman Aff. Ex. 17.)

In 2005 and 2006, Plaintiff submitted several engineers' reports and building permit

applications that Village officials rejected because, among other reasons, she had failed to

convince the Village that the house was structurally sound.  (Pl.'s 56.1 ¶¶ 47, 51–53, 55.)  In July

2006, Plaintiff submitted a permit application with an accompanying survey map, (*id.* ¶ 57; *see*

Sussman Aff. Ex. 25), and the Village code enforcement officer subsequently denied the

application on the basis that the house's lot coverage and setback measurements did not conform

to the Village zoning code, and that the code prohibited the enlargement of structures that did not

conform thereto, (*id.* ¶ 58; Sussman Aff. Ex. 26).  He indicated that in order to continue with

construction, Plaintiff would need to apply to the ZBA for variances to the zoning code.  (Pl.'s

56.1 ¶ 58; Sussman Aff. Ex. 26.)

Several rounds of variance applications and ZBA meetings followed beginning in August

2006 and continuing through July 2007.  (Pl.'s 56.1 ¶¶ 59–60, 63, 76, 78, 83, 86.)  During this

time, the ZBA granted Plaintiff a variance for the size of her lot, but denied variances for lot

coverage and setbacks because, among other reasons, Plaintiff failed to provide the ZBA with

3

sufficient information to grant the variances.[4]  (*Id.* ¶¶ 72, 80, 94; *see* Sussman Aff. Exs. 34, 40.)

Also during this time, a major concern arose regarding whether the newly constructed attic

would function as an additional story in the house, thereby rendering the house nonconforming

with respect to Village zoning regulations regarding maximum allowable stories.[5]  (*See* Pl.'s 56.1

¶¶ 66, 75, 78, 84–85; Sussman Aff. Exs. 30, 40, 44.)

      In May 2007, Defendant John Fenton took over as the Village's new permanent code

enforcement officer and building inspector.  (Pl.'s 56.1 ¶ 90; Davignon Aff. Ex. DD, at 22.)  In

July 2007, an engineer hired by Plaintiff wrote to Fenton that he believed the house was safe

enough for construction to continue.  (Pl.'s 56.1 ¶ 95; Sussman Aff. Ex. 47.)  That same month,

Fenton inspected the house and subsequently removed the order of unsafe condition, but only to

permit Plaintiff to enter the house to clean it, weatherproof it, and perform cosmetic work—not

to continue construction.  (Pl.'s 56.1 ¶¶ 96, 100; Sussman Aff. Ex. 48.)  Fenton was accompanied

on his inspection by a code compliance specialist from the New York State Division of Code

Enforcement and Administration.  (Pl.'s 56.1 ¶ 98.)  The state officer opined that the house was

unsafe and warned that the attic could easily be converted to a habitable space and thus qualify

as a nonconforming story.  (Sussman Aff. Ex. 50.)  He suggested measures that could be taken to

ensure that the attic would remain a non-habitable space, such as scheduling regular inspections

by the Village or imposing limitations on attic insulation, lighting, and/or outlets.  (*Id.*)

---

[4]      The ZBA indicated, for instance, that Plaintiff "ha[d] not supplied enough information and there [are] enough unanswered questions as to what 'new' versus 'old' is, [and] what constitutes [a] setback" such that it could not make a "logical ruling" on the variances.  (Sussman Aff. Ex. 34, at 1.)

[5]      The maximum number of stories for houses in Wappingers Falls' single-family residential district, where Plaintiff's house is located, is 2.5.  (Affirmation of Luke C. Davignon, submitted in support of Defendants' Motion for Summary Judgment ("Davignon Aff."), (Doc. 27-1), Ex. EE.)

In November 2007, Fenton issued a stop-work order on Plaintiff's house.[6] (Sussman Aff. Ex. 55.)  That same month, Plaintiff submitted another building permit application to be able to continue construction, (Pl.'s 56.1 ¶ 109; *see* Sussman Aff. Ex. 56), and Fenton denied the application, once again due to fact that Plaintiff lacked the required variances from the Village zoning code—not only for lot coverage and setback, but also for lot depth, (Pl.'s 56.1 ¶ 110; *see* Sussman Aff. Ex. 57).  Plaintiff again sought variances from the ZBA, and in December 2007 the ZBA denied them on the ground that Plaintiff failed to present it with any new information not included in previous applications.  (Sussman Aff. Ex. 59.)  Also in December 2007, Fenton posted the house as unsafe, preventing Plaintiff from occupying it.  (*Id.* Ex. 62.)[7]

In the summer of 2008, Plaintiff again applied to Fenton for a building permit, and Fenton again denied the request.  (*Id.* Ex. 68.)[8]  Despite this, Fenton indicated to Plaintiff that the revised plans she submitted with her application had "satisfied" him and were a "substantial

---

[6]     Plaintiff avers the stop-work order was issued "without any proof that work was being done at the premises," (Pl.'s 56.1 ¶ 108), but the exhibits seem to suggest that the order was issued in response to neighbors' complaints regarding ongoing work at the house, (*see* Sussman Aff. Ex. 45, at 40–41).

[7]     Plaintiff avers that Fenton "revers[ed] himself" and that there was "no factual basis for the placarding of the building," (Pl.'s 56.1 ¶¶ 116–17), but Fenton had not previously declared the house safe for occupancy; based upon his and the code compliance specialist's inspection, he had only permitted Plaintiff to enter the house to clean, weatherproof, and perform cosmetic work, (Sussman Aff. Exs. 48, 63).  After Fenton posted the house as unsafe, Plaintiff refused to vacate the house, and in February 2008 Fenton issued Plaintiff a ticket for occupying an illegal structure.  (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶¶ 18, 118, 121; *see* Sussman Aff. Ex. 64.)  The ticket was later transferred from the Wappingers Falls Village Court to the Fishkill Town Court and dismissed for failure to prosecute.  (Pl.'s 56.1 ¶¶ 123–24.)

[8]     Plaintiff avers that Fenton indicated that he would grant the permit if Plaintiff met several conditions, (Pl.'s 56.1 ¶ 130), but the exhibits demonstrate only that Fenton instructed Plaintiff to remove the insulation above the attic floor level or remove the attic steps to ensure that the attic area would not be used as habitable space, (Davignon Aff. Ex. S, at 1; Sussman Aff. Ex. 69).

change in what [he was] looking for to get her back in front of the ZBA." (Davignon Aff. Ex. DD, at 26.)   Plaintiff again appeared before the ZBA in October 2008 to request the necessary variances.  (Pl.'s 56.1 ¶¶ 131–32.)  The ZBA concluded that the variance would result in an undesirable change in the character of the neighborhood or a detriment to nearby properties, and would have an adverse impact on the physical or environmental conditions in the neighborhood.  (Sussman Aff. Ex. 71, at 1.)  It also concluded, however, that the benefit to Plaintiff would outweigh the detriment to the neighborhood because the house was in disrepair and issuing a building permit would allow Plaintiff to finish construction.  (*Id.* Ex. 71, at 2.)  It therefore granted the requested variances on the following conditions:  (1) Plaintiff must remove all unregistered vehicles and resolve all property maintenance code violations; (2) Plaintiff must not occupy the house until she obtains a certificate of occupancy; (3) a professional engineer must certify the structural integrity of the building; (4) Plaintiff must remove all outdoor storage sheds; and (5) Plaintiff must remove insulation above the attic floor level or stairs ascending to the attic.  (*Id.* Ex. 71, at 2; Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶¶ 20, 133.)[9]

　　　　Plaintiff filed the Complaint in the instant case on November 13, 2008, asserting causes of action under 42 U.S.C. § 1983 ("Section 1983") against the ZBA and Fenton for violating her substantive due process rights; against Fenton for denying her equal protection of the law under the Fourteenth Amendment to the U.S. Constitution; and against the ZBA and Fenton for retaliating against her for her prior use of the courts under the First Amendment to the U.S.

---

[9]　　　　In her opposition papers, Plaintiff raises, for the first time, facts that occurred after November 13, 2008, the date on which she filed her Complaint in the instant action.  (*See, e.g.*, Pl.'s 56.1 ¶¶ 152–57.)  I decline to consider these facts, as they do not form the basis for Plaintiff's claims, and the complaint may not be amended simply by raising new facts in opposition to Defendants' motion.  *See Alali v. DeBara*, No. 07-2916, 2008 WL 4700431, at *3 n.6 (S.D.N.Y. Oct. 24, 2008).

Constitution.  (Doc. 1.)  The causes of action are based upon Defendants' denial of a building

permit to Plaintiff for construction to her house.  (*Id.* ¶¶ 42–44.)  Because, as the record

demonstrates, the ZBA did not deny Plaintiff a building permit, but rather denied her, and later

conditionally granted her, area variances necessary to obtain a building permit, the Court

construes Plaintiff's claims against ZBA as directed at their decisions with respect to the

variances Plaintiff sought.  On September 13, 2010, Defendants moved for summary judgment.

(Doc. 27.)

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if

satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every

element of the claim.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).  Where, as here, affidavits are used to support or oppose the motion, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

### B.    Quasi-Judicial Immunity

Defendants contend that they are immune from the instant claims under the doctrine of quasi-judicial immunity, which is a form of absolute immunity that applies to non-judicial officers when they perform judicial functions.  In order to qualify, "[t]he proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity."  *Antoine v. Byers & Anderson*, 508 U.S. 429, 432 (1993).  Absolute immunity protects judges and certain other judicial officials from civil liability for "acts undertaken in furtherance of their judicial functions."  *Quitoriano v. Raff & Becker, LLP*, 675 F. Supp. 2d 444, 449 (S.D.N.Y. 2009) (citing *Austern v. Chi. Bd. Options Exch., Inc.*, 898 F.2d 882, 885 (2d Cir. 1990)).  The Supreme Court "has extended absolute immunity to certain others who perform functions closely associated with

the judicial process," *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985)—*i.e.*, to those who

perform "quasi-judicial" functions, *Quitoriano*, 675 F. Supp. 2d at 449.

> [T]he touchstone for the doctrine's applicability has been performance of the
> function of resolving disputes between parties, or of authoritatively adjudicating
> private rights.  When judicial immunity is extended to officials other than judges,
> it is because their judgments are functionally comparable to those of judges—that
> is, because they, too, exercise a discretionary judgment as a part of their function.

*Antoine v. Byers & Anderson*, 508 U.S. 429, 435–36 (1993) (alterations, internal quotation

marks, and citations omitted).  "If an individual's duties do not require him to exercise

discretionary judgment but rather are 'purely ministerial and administrative' in nature, he will

not receive the protection of judicial immunity."  *Quitoriano*, 675 F. Supp. 2d at 450 (quoting

*Antoine*, 508 U.S. at 437 n.11).  "Nor will the individual receive immunity if he is shown to have

acted in a manner outside the scope of his official judicial duties."  *Id.* (citing *Anderson v.

Conboy*, No. 94-9159, 1997 WL 177890, at *7–8 (S.D.N.Y. Apr. 14, 1997), *rev'd on other

ground*s, 156 F.3d 167 (2d Cir. 1998)).

The applicability of quasi-judicial immunity is determined by considering not the identity

of the actor but rather the nature of the functions the actor performs.  *See Austern*, 898 F.2d at

885.  In applying this "functional" approach, a court must consider the following factors to

determine whether a particular individual is entitled to quasi-judicial immunity:

> (a) the need to assure that the individual can perform his functions without
> harassment or intimidation; (b) the presence of safeguards that reduce the need for
> private damages actions as a means of controlling unconstitutional conduct; (c)
> insulation from political influence; (d) the importance of precedent; (e) the
> adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202; *accord Gross v. Rell*, 585 F.3d 72, 88 (2d Cir. 2009).

As to the ZBA, Defendants have not satisfied their burden that quasi-judicial immunity

applies.  First, Defendants have failed to demonstrate that quasi-judicial immunity applies not

only to individuals but also to entities such as the ZBA.  The Supreme Court has noted that absolute immunity is not available in official-capacity actions involving claims against an entity. *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) ("When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses . . . .  In an official-capacity action, these defenses are unavailable. The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.") (citations omitted).  Indeed, the Second Circuit has recently observed that "no court case that we have found extends judicial immunity to an *institution* (as opposed to an individual)."  *Gross*, 585 F.3d at 93 (emphasis in original).  Similarly, various other circuit courts have noted that quasi-judicial immunity only extends to an *individual* sued in his or her *personal* capacity.  *See VanHorn v. Oelschlager*, 502 F.3d 775, 778–79 (8th Cir. 2007); *Alkire v. Irving*, 330 F.3d 802, 810–11 (6th Cir. 2003); *Turner v. Houma Municipal Fire & Police Serv. Bd.*, 229 F.3d 478, 482–86 (5th Cir. 2000); *Bass v. Attardi*, 868 F.2d 45, 50–51 (3d Cir. 1989); *accord McKivitz v. Twp. of Stowe*, No. 08-1247, 2010 WL 6004441, at *9 (W.D. Pa. Dec. 22, 2010).

Even if quasi-judicial immunity does apply to municipal entities, Defendants have not demonstrated that the ZBA is entitled to such immunity under federal law.  The Second Circuit has made clear that where, as here, defendants are sued in federal court on federal claims, the federal law on quasi-judicial immunity applies.  *See Gross*, 585 F.3d at 81.  Although Defendants cite to cases regarding quasi-judicial immunity as applied to zoning boards of appeals and their members, those cases address the application of quasi-judicial immunity under New York—not federal—law.  For example, *Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.*, 192 F. Supp. 2d 143, 157 (S.D.N.Y. 2002), was decided before *Gross* clarified

that federal law should apply, and it cited only to New York state cases and did not undertake—

or even reference—the federal multi-factor "functional" approach  from *Cleavinger v. Saxner*

described above.  Similarly, *Alfano v. Village of Farmingdale*, 693 F. Supp. 2d 231, 232–33

(E.D.N.Y. 2010), followed *Hi Pockets* and neither addressed the *Cleavinger* factors nor cited

*Gross*.  There, too, the court ignored the multi-factor "functional" approach under federal law,

instead looking to principles and precedent under state law.  *See id.* at 233.

    For the same reason, Defendants have failed to demonstrate that quasi-judicial immunity

applies to Fenton.  Defendants are unable to point to any authority extending such immunity to

building inspectors under federal law—only state law.  While the cases applying state law are

persuasive in their pronouncement that local officials who issue building permits exercise

discretion sufficient to warrant the application of quasi-judicial immunity, *see, e.g.*, *Hi Pockets*,

192 F. Supp. 2d at 156–57 (discussing discretion of city commissioner who issued building

permits), federal law entails more than simply a question as to the discretion of such officials,

and federal courts have declined to apply quasi-judicial immunity based upon other

considerations, *see, e.g.*, *Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*, 98

F.Supp.2d 347, 357 (S.D.N.Y. 2000) (declining to extend immunity because building inspectors'

roles are "not functionally comparable to those of judge or prosecutor[, as] . . . they certainly are

not insulated from political influence").

    While it is true that an analysis concerning the applicability of quasi-judicial immunity

under state versus federal law may overlap in significant ways, *see, e.g.*, *Gross*, 585 F.3d at 80–

82 (determining that consideration of *Cleavinger* factors under federal law intersected with

nature and function of Connecticut probate court system, and certifying questions to Connecticut

Supreme Court on issue); *Rudow v. City of N.Y.*, 822 F.2d 324, 329 (2d Cir. 1987) ("The same

11

principles that render [defendant] absolutely immune from personal liability under federal law also protect her under New York law."), Defendants, who bear the burden, have not addressed the *Cleavinger* factors and have proffered neither facts nor arguments sufficient for this Court to determine that quasi-judicial immunity should apply to Defendants under that federal standard. The Court is unable to locate any Second Circuit authority applying such immunity under federal law in these circumstances and therefore declines to decide the question as an issue of first impression.

### C. Plaintiff's Section 1983 Claims

#### 1. Substantive Due Process

As noted above, Plaintiff bases each of her claims on Defendants' decisions with respect to her applications for building permits and variances.  To state a substantive due process claim, Plaintiff must demonstrate that (1) she had a "valid 'property interest' in a benefit that was entitled to constitutional protection," (2) she was denied that interest, and (3) Defendants' actions in depriving her of that interest were "so outrageously arbitrary as to be a gross abuse of governmental authority."  *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) (internal quotation marks omitted); *see Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006) (plaintiff must establish government misconduct was "arbitrary," "conscience-shocking," or "oppressive in the constitutional sense," and not merely "incorrect or ill-advised") (internal quotation marks omitted).  "In assessing a substantive due process claim in the context of land use regulation, [the] Court is always 'mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies.'"  *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) (second and third alterations in original) (quoting

*Zahra v. Town of Southold*, 48 F.3d 674, 679-80 (2d Cir. 1995)). Indeed, "the Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of the state courts." *Zahra*, 48 F.3d at 680.

"In order for an interest in a particular land-use benefit to qualify as a property interest for the purposes of the . . . due process clause[,] a landowner must show a 'clear entitlement' to that benefit." *See O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007) (citing *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006)). A mere "abstract need or desire" for the benefit is insufficient. *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 915 (2d Cir. 1989) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). This "clear entitlement" test must be applied with "considerable rigor." *Id.* at 918. The test "focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Crowley*, 76 F.3d at 52 (emphasis in original) (quoting *Zahra*, 48 F.3d at 680) (internal quotation marks omitted); *see Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) ("entitlement turns on whether the issuing authority . . . is required to issue [permit] upon ascertainment that certain objectively ascertainable criteria have been met"). Even if "objective observers would estimate that the probability of [obtaining the relief sought] was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." *RRI Realty*, 870 F.2d at 918.

Here, Plaintiff has failed to establish a valid property interest in the building permits and in an unconditional variance. I consider first Plaintiff's claim as to Fenton, based upon his two building permit denials, in November 2007 and August 2008. (*See* Sussman Aff. Exs. 57, 68.) The record demonstrates both that the permits Plaintiff sought could have been, and indeed were,

denied on legitimate, non-arbitrary grounds, and that Fenton had wide discretion in deciding to do so.  *RRI Realty* is instructive here.  There, as here, the Second Circuit considered the question of "whether an applicant for a building permit . . . had a sufficiently clear entitlement to the permit to constitute a property interest protected by the Due Process Clause."  *RRI Realty*, 870 F.2d at 912.  Reversing the district court, the court found that the record was insufficient to support such a finding.  The court advised that an applicant for a building permit must show a "certainty or a very strong likelihood" of issuance of the permit, *id.* at 917 (quoting *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985)), and held that the plaintiff there did not making such a showing, despite evidence of statements by municipal officials that approval of the application was "probably forthcoming," *id.* at 919.  Notably, the court held that "[t]he fact that the permit could have been denied on non-arbitrary grounds defeats the federal due process claim."  *Id.* at 918.  Indeed, because the permit-issuing agency offered valid reasons for denying the permit application and because the village code conferred "wide discretion" on the agency, the court found that "[a]s a matter of law, there was no property interest in the permit."  *Id.* at 919.

That rationale applies with equal force here.  The record demonstrates that Plaintiff's building permit could have been—and indeed was—denied on non-arbitrary grounds.  Specifically, Fenton's November 2007 letter denying the first such application cites as the grounds for the denial the various zoning regulations—lot coverage, front- and side-yard setback, and lot depth—as to which Plaintiff's house was nonconforming.  (*See* Sussman Aff. Ex. 57.)  As the Village Code makes clear, where existing conforming uses of buildings are, by means of changes to the Code, subsequently made nonconforming—as Plaintiff makes clear is the case here, (*see* Pl.'s 56.1 ¶ 9 ("Plaintiff's house was built approximately 130 years ago, long before

passage of the village's current zoning ordinance.")—the uses are nonetheless deemed nonconforming for the purposes of the current Code, *see* Village of Wappingers Falls Code ("VWFC") § 151-20(A) (attached as Davignon Aff. Ex. EE).[10]  And, under the Code, any nonconforming building or structure "shall not be altered, enlarged or extended unless the use therein is changed to a conforming use."  *Id.* § 151-20(C)(1).  Clearly, then, Fenton could have denied—and indeed did deny—the permit on the ground that Plaintiff sought to alter and enlarge her nonconforming house by continuing to construct a vertical addition thereto.  As such, Plaintiff cannot demonstrate that there was a "certainty or a very strong likelihood" of issuance of the permit, and she therefore did not have a clear entitlement to such permit.  *See, e.g.*, *Leonard P'ship v. Town of Chenango*, 779 F. Supp. 223, 235 (N.D.N.Y. 1991) (denying substantive due process claim stemming from denial of building permit because the "permit could have been denied solely on the non-arbitrary basis that [plaintiff] failed to submit a site plan as required by § 73-32(B) of the Town Code"; "[t]hus, even absent the alleged denial of due process, [plaintiff] simply cannot show that there was either a 'certainty or a very strong likelihood' that the building permit application would have been granted").

Fenton's second denial of Plaintiff's building permit application in August 2008 demonstrates that here, as in *RRI Realty*, Fenton had discretion in evaluating the application and deciding whether to grant or deny it.  Plaintiff argues that Fenton's having conditioned the grant

---

[10]        Section 151-20(A) reads,

> Except as otherwise provided herein . . . , the lawfully permitted use of land or
> buildings existing at the time of the adoption of this chapter may be continued,
> although such use does not conform to the standards specified by this chapter for
> the district in which such land or building is located.  Said uses shall be deemed
> nonconforming uses.

VWFC § 151-20(A).

of the building permit on Plaintiff taking steps to ensure that the new attic would be non-habitable space demonstrates hostility toward Plaintiff, (Pl.'s Opp'n at 13);[11] it is equally plausible that it demonstrates that Fenton attempted to work with Plaintiff to ensure that her alteration and/or enlargement of the house was changed to a conforming use under Section 151-20(C)(1) of the Code.  In any event, it demonstrates that Fenton was exercising his discretion under the Code.  The Code's language further supports Fenton's discretion in this regard:  the chapter of the Code dealing with zoning regulations charges Fenton, as building inspector, with "administer[ing] and enforce[ing] the provisions of this chapter covering disposition of unoccupied or unsafe buildings or structures," and provides that "after determining that such proposed work, use and occupancy are in compliance with all provisions of this chapter and other applicable ordinances and codes, [he] *may* approve any such application and issue a zoning permit in connection therewith."  *See* VWFC §§ 151-21(D), 151-22(C)(5)(a) (emphasis added).[12] Courts have held that such permissive language is indicative of discretion and precludes a finding that a plaintiff had a valid property right in the permit at issue.  *See, e.g.*, *Leland*, 235 F. Supp. 2d at 163–64 (language in Code providing that building inspector is "authorized" or "empowered" to take action indicates discretion, as opposed to language providing that building inspector "shall" take a particular action).

Plaintiff's claim against the ZBA fails for similar reasons.  The discretion of zoning boards of appeals in granting or denying variances from zoning codes is well-settled.  *See, e.g.*,

---

[11]    "Pl.'s Opp'n" refers to Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment."  (Doc. 29-88.)

[12]    Available at http://www.ecode360.com/?custid=WA0129.  (*See* Davignon Aff. ¶ 34.)  As a matter of statutory construction, this Court reads each section in the context of the whole Code. *See Leland v. Moran*, 235 F. Supp. 2d 153, 163 (N.D.N.Y. 2002), *aff'd*, 80 F. App'x 133 (2d Cir. 2003); *Erin Estates, Inc. v. McCracken*, 921 N.Y.S.2d 730, 732 (3d Dep't 2011).

*Lamar Adver. of Penn, LLC v. Pitman*, 573 F. Supp. 2d 700, 707 (N.D.N.Y. 2008) ("It is well established under New York law that '[l]ocal zoning boards have broad discretion in considering applications for variances[.]'") (alterations in original) (quoting *Ifrah v. Utschig*, 98 N.Y.2d 304, 308 (2002)); *Rembar v. Bd. of Appeals of the Vill. of E. Hampton*, 539 N.Y.S.2d 81, 82 (2d Dep't 1989) ("It is axiomatic that a zoning board of appeals has the power to interpret the provisions of the local zoning ordinance or code.  The mere fact that an applicant applies for a variance with respect to proposed construction does not preclude the board from rendering a decision that based upon its interpretation of the provisions of the ordinance a variance is not required.") (citations omitted).  Indeed, New York State Village Law, which establishes local zoning boards of appeal, *see* N.Y. Village Law § 7-712, vests such boards with the authority to grant variances, and lists various factors that a board must take into account in making such determinations, *see id.* § 7-712-b(3)(a)–(b).[13]  Crucially, the law also vests zoning boards of appeal with the

---

[13]    The law provides that,

> [i]n making its determination, the zoning board of appeals shall take into consideration the benefit to the applicant if the variance is granted, as weighed against the detriment to the health, safety and welfare of the neighborhood or community by such grant.  In making such determination the board shall also consider:  (1) whether an undesirable change will be produced in the character of the neighborhood or a detriment to nearby properties will be created by the granting of the area variance; (2) whether the benefit sought by the applicant can be achieved by some method, feasible for the applicant to pursue, other than an area variance; (3) whether the requested area variance is substantial; (4) whether the proposed variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or district; and (5) whether the alleged difficulty was self-created; which consideration shall be relevant to the decision of the board of appeals, but shall not necessarily preclude the granting of the area variance.

N.Y. Village Law § 7-712-b(3)(b).  The ZBA's written decision reflects that it made a finding as to each of the above factors in reaching its determination.  (*See* Sussman Aff. Ex. 71.)

discretion to conditionally grant variances from local zoning regulations. *See id.* § 7-712-b(4) (ZBAs have "authority to impose such reasonable conditions and restrictions as are directly related to and incidental to the proposed use of the property," "consistent with the spirit and intent of the zoning local law," and "imposed for the purpose of minimizing any adverse impact such variance may have on the neighborhood or community"); *see also 150 Washington Ave. Corp. v. Bd. of Zoning & Appeals*, 744 N.Y.S.2d 456, 457 (2d Dep't 2002) (authority of ZBAs to attach conditions to variances is "well settled").

Plaintiff argues that the ZBA acted arbitrarily and outside its authority in conditioning the grant of her area variance upon her vacating the premises until a certificate of occupancy was issued. (Pl.'s Opp'n at 7.) Plaintiff's argument, however, goes toward the propriety of the ZBA's decision and ignores the threshold question of whether she had a clear entitlement to a variance—conditional or unconditional—in the first place. *See, e.g.*, *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 504–05 (2d Cir. 2001) (holding Board's discretion in granting permits defeated plaintiff's substantive due process claim, and addressing plaintiff's argument that "the Board came to an improper conclusion" under the claim's second element); *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 237 (E.D.N.Y. 2009) ("It is only when [a federally protected property] right is established that the court may turn to a discussion of the second prong of the due process analysis, *i.e.*, . . . the nature of defendant's conduct . . . ."). Irrespective of the propriety of any of the several conditions attached to the variance, Plaintiff cannot overcome the fact that the ZBA had the discretion to grant or deny the variance, either conditionally or unconditionally. The parties here do not point to any provision of the Village Code that divests the ZBA of its discretionary authority under state law; to the contrary, the Code is consistent in its vesting of discretionary authority with the ZBA. *See, e.g.*, VWFC § 151-25(C)(2). Such

discretionary authority is sufficient to defeat Plaintiff's due process claim against the ZBA.  *See,*
*e.g.*, *Lamar Adver.*, 573 F. Supp. 2d at 707 (granting summary judgment dismissing substantive
due process claim for lack of property interest because Village Law § 7-712-b(3)(b) vested ZBA
with discretion to deny variance); *R & V Dev., LLC v. Town of Islip*, No. 05-5033, 2007 WL
14334, *4–5 (E.D.N.Y. Jan. 3, 2007) (granting motion to dismiss substantive due process claim
for lack of property interest because under state law ZBA had discretion to deny variance);[14] *see*
*also Crowley*, 76 F.3d at 52 (affirming dismissal of substantive due process claim for lack of
valid property interest in variance where local zoning regulations granted zoning board with
discretionary approval powers); *Vertical Broad., Inc. v. Town of Southampton*, 84 F. Supp. 2d
379, 393 (E.D.N.Y. 2000) (ordinance according town discretion to grant or deny zoning variance
precluded property right in variance); *Riley v. Town of Bethlehem*, 44 F. Supp. 2d 451, 464–65
(N.D.N.Y. 1999) (same).[15]  Accordingly, Defendants' motion for summary judgment on the
substantive due process claim is granted.

### 2.      Equal Protection and First Amendment Retaliation

Plaintiff asserts an equal protection claim against Fenton and First Amendment retaliation
claims against Fenton and the ZBA.  Plaintiff premises the claims on the same theory—that
Fenton's and the ZBA's actions were retaliation for Plaintiff's initiating her state court
proceeding in October 2004 that resulted in the vacatur of the ZBA's revocation of her certificate

---

[14]      New York State Town Law Section § 267-b(3)(b) is worded nearly identically to Village
Law Section 7-712-b(3)(b), and affords town ZBAs with the same discretion as village ZBAs.
*Compare* N.Y. Village Law § 7-712-b(3)(b), *with* N.Y. Town Law § 267-b(3)(b).

[15]      Having found no property interest, I need not address the remaining elements of the
substantive due process claim, but I note my doubts that Plaintiff could establish that
Defendants' actions were "so outrageously arbitrary as to be a gross abuse of governmental
authority," *Lisa's Party City*, 185 F.3d at 17 (internal quotation marks omitted), as frustrating
and perhaps incorrect as those actions may have been.

of occupancy.  (Pl.'s Opp'n at 2–3, 15.)[16]  To prevail on her equal protection claim against

Fenton, which she asserts as a claim of selective enforcement, Plaintiff must "show both (1) that

[she was] treated differently from other similarly situated individuals, and (2) that such

differential treatment was based on 'impermissible considerations such as race, religion, intent to

inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a

person.'"  *Harlen Assocs.*, 273 F.3d at 499 (internal quotation marks omitted) (quoting *LaTrieste

Rest. & Cabaret v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).  To prevail on her

First Amendment retaliation claims against Fenton and the ZBA, Plaintiff must show (1) "that

[her] conduct was protected by the [F]irst [A]mendment" and (2) "that defendants' conduct was

motivated by or substantially caused by [her] exercise of free speech."  *Gagliardi v. Vill. of

Pawling*, 18 F.3d 188, 194 (2d Cir. 1994).[17]

> a.      **Fenton**

Where, as here, an equal protection claim is based on an alleged First Amendment

violation, the former "coalesces with the latter."  *Kempkes v. Downey*, No. 07-1298, 2008 WL

852765, at *6 (S.D.N.Y. Mar. 31, 2008) (collecting cases).  "Where this is the case, the equal

---

[16]      Indeed, the parties do not discuss the First Amendment claim separately in their
submissions, but rather discuss it in the context of the equal protection claim.

[17]      The Second Circuit recently observed that in typical First Amendment retaliation cases, a
plaintiff must also allege that the defendant's actions effectively chilled the plaintiff's exercise of
his or her First Amendment rights, but where, as here, the plaintiff has alleged other harm, he or
she need not prove that speech was chilled.  *See Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir.
2011); *see also Puckett*, 631 F. Supp. 2d at 239 (chilling element is required only "in cases where
a plaintiff states no harm independent of the chilling of his speech").  As Plaintiff alleges a
retaliatory denial of building permits (as to Fenton) and a denial of an unconditional variance (as
to the ZBA), she has alleged other harm.  *See Zherka*, 634 F.3d at 645 (citing, as examples of
cases where other harm was alleged, zoning cases involving alleged retaliatory revocation of
building permit or retaliatory failure to enforce zoning laws).

protection claim is dependent on the First Amendment claim; in other words where the First

Amendment claim has failed, the equal protection claim fails, too." *Id.*; *accord Gentile v. Nulty*,

No. 05-7090, 2011 WL 724663, at *7 (S.D.N.Y. Feb. 25, 2011).

Plaintiff's claims against Fenton must fail because she has not adduced sufficient

evidence to raise a triable issue of fact as to a causal connection between the initiation of her

state court case and Fenton's actions in 2008 (which, for the purposes of the First Amendment

retaliation claim, is tantamount to the requirement that the selective treatment be based on an

intent to punish Plaintiff for exercising her constitutional rights).  Namely, in the absence of

evidence that Fenton was aware of Plaintiff's state court proceeding, he cannot be said to have

retaliated against Plaintiff *because of that proceeding*.  As Defendants point out, Fenton was not

a party to the 2004 litigation, and he was not familiar with Plaintiff's house prior to the time he

assumed the positions of building inspector and code enforcement officer in 2007.  (Defs.' Mem.

at 12; Defs.' Reply Mem. at 8; *see* Davignon Aff. Ex. DD, at 8; Sussman Aff. Ex. 17, at 1.)[18]

Plaintiff does not refute this, and the only evidence in the record is that Fenton had no knowledge

of the 2004 litigation when he engaged in the allegedly retaliatory conduct in 2008.  While

testifying at an April 1, 2009 hearing held in connection with a related state court proceeding,

Fenton explicitly denied having knowledge of the March 2005 state court decision issued in

connection with Plaintiff's case:

---

[18]     "Defs.' Mem." refers to Defendants' Memorandum of Law, submitted in support of
Defendants' motion for summary judgment.  (Doc. 27-38.)

> Q.      From your review of the file, are you aware that there came a time
> before December of 2004 when the ZBA sought to revoke the certificate of
> occupancy for the Tomlinses in the building?
> A.      I don't recall that.
> Q.      Are you aware that there was a judicial decision with regard to the
> certificate of occupancy issued by this court on March 17, 2005?
> A.      No, I don't.
> Q.      Are you aware that there was a certificate of occupancy for this
> building for the Tomlinses at all times since 1994?
> . . . .
> A.      No, I don't.

(Sussman Aff. Ex. 45, at 56–57.)

Even if this Court disregards Fenton's testimony, as he is an interested witness who a jury

is not required to believe, *see, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

151 (2000) (on motion for summary judgment, district court "must disregard all evidence

favorable to the moving party that the jury is not required to believe"); *Williams v. City of White

Plains*, 718 F. Supp. 2d 374, 377 (S.D.N.Y. 2010) (evidence that court should disregard on

summary judgment "includes testimony and affidavits from interested witnesses"), Plaintiff's

First Amendment retaliation claim still must fail because Plaintiff herself has not set forth any

evidence upon which a reasonable jury could conclude that Fenton's allegedly retaliatory actions

in 2007 and 2008 has any causal connection with her use of the courts in 2004, *see, e.g.*, *Shaheen

v. Filion*, No. 04-0625, 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (adopting report and

recommendation) (granting summary judgment for defendant on First Amendment retaliation

claim for lack of causal connection where no evidence that defendant was aware of plaintiff's

protected activity at time of allegedly retaliatory conduct); *Caidor v. Onondaga Cnty.*, No. 03-

0031, 2006 WL 2595202, at *9 (N.D.N.Y. Sept. 11, 2006) (same); *Moran v. City of New

Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (same).  As such, the equal protection claim

against Fenton must fail as well.  *See Kempkes*, 2008 WL 852765, at *6.

**b.      The ZBA**

Plaintiff's First Amendment retaliation claim against the ZBA does not suffer from the same infirmity as her claim against Fenton.  The ZBA was a party to Plaintiff's 2004 state-court challenge, (*see* Sussman Aff. Ex. 17, at 1), and Lloyd W. Frink, IV, the Chair of the ZBA in 2008, served on the ZBA for at least the period of time from 2004 through 2008, (*see* Frink Dep. at 17).[19]  Nonetheless, here, as with Plaintiff's First Amendment retaliation claim against Fenton, the viability of the claim turns on whether there was a causal connection between the protected speech and the adverse action.[20]  Construing the evidence in the light most favorable to Plaintiff, as I must, I find that Plaintiff has adduced sufficient circumstantial evidence to raise a triable issue of fact as to whether the ZBA's actions were motivated by Plaintiff's protected activity. *See, e.g.*, *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) ("[c]ausation can be established . . . indirectly by means of circumstantial evidence"); *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996) (circumstantial evidence often only means available to prove retaliation); *cf. Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir. 1989) (defendants "rarely so cooperative as to include a notation" of retaliatory motive) (internal quotation marks omitted).

First, the record demonstrates that by imposing the condition that Plaintiff vacate her house until she obtained a certificate of occupancy, the ZBA deviated from its standard procedure.  *See, e.g.*, *Women's Interart Ctr., Inc. v. N.Y.C. Econ. Dev. Corp.*, 2005 WL 1241919,

---

[19]      "Frink Dep." refers to the Deposition of Lloyd W. Frink, IV, taken on March 24, 2010. (Davignon Aff. Ex. CC.)

[20]      Defendants do not contest whether Plaintiff's state-court challenge to the revocation of her building permit and certificate of occupancy constitutes protected activity, and I find as a matter of law that it does.  *See, e.g.*, *Gagliardi*, 18 F.3d at 195 ("Here, the [plaintiffs] commenced Article 78 proceedings and attended public meetings and hearings of the Board of Trustees, the Planning Board and the ZBA to voice their concerns about the alleged violations. . . . This conduct clearly is protected by the First Amendment.").

at *28 (S.D.N.Y. May 23, 2005) ("'[D]epartures from the normal procedural sequence' of governmental decisionmaking 'also might afford evidence that improper purposes are playing a role' . . . .") (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)); *Green v. City of Montgomery*, 792 F. Supp. 1238, 1254 (N.D. Ala. 1992) ("circumstantial evidence commonly encountered which can support an inference [of] retaliatory motive" includes departures from the normal procedure).  As an initial matter, it is particularly noteworthy that the condition that Plaintiff obtain a certificate of occupancy before occupying the house relates directly to—and, indeed, contradicts—the March 2005 ruling in Plaintiff's state court case.  As noted above, the state court explicitly vacated the ZBA's revocation of Plaintiff's certificate of occupancy, and, crucially, the record does not demonstrate that, at any point thereafter, either the court's decision was reversed or the certificate of occupancy was somehow validly revoked.  Frink himself acknowledged that he was not aware of any such action in October 2008.  (Frink Dep. at 106–07.)  That the ZBA effectively ordered Plaintiff to obtain a certificate of occupancy that, *under the still-valid state court ruling, she already had* provides support for her claim that the imposition of this condition was retaliation for her state-court challenge to the ZBA's actions.  Defendants argue that they ordered Plaintiff to vacate because the premises were unsafe, but they apparently did not seek to revoke the certificate of occupancy, rendering puzzling their requirement that Plaintiff vacate until she obtained one.

Indeed, the record suggests that the ZBA did not have authority to impose such a condition.  Frink testified that the Village had posted the house as unsafe and unfit for habitation, but that, according to Plaintiff's neighbors, Plaintiff was nonetheless residing there.  (*Id.* at 101.) Frink testified that he was aware that the Village had legal recourse for Plaintiff's violations with respect to the posting—by issuing citations or obtaining a court order for eviction, for instance—

24

and that the Village had indeed commenced legal proceedings, but that at least one of those

proceedings had been withdrawn and, as of October 2008, Frink was unaware of the status of the

remaining proceedings.  (*Id.* at 107–11.)  Crucially, Frink admitted that the ZBA imposed the

condition *because Plaintiff was still residing in the house*, but that it *likely did not have authority*

*to do so*:

> Q.      . . . [C]ondition number two, quote, [n]o occupancy occurs in the
> structure until a [certificate of occupancy] is granted, do you see that?
> A.      I do.
> Q.      What was the basis for that, please?
> A.      During testimony for a prior variance application[,] evidence was
> entered into the record that the structure was being dwelled in by Mrs. Tomlins
> and her children and potential grandchildren at the same time that the structure
> was posted as unsafe.
> Q.      And you felt the ZBA had the authority to set this kind of
> condition based on that?
> A.      No, not necessarily.

(*Id.* at 101.)  This testimony, coupled with the fact that Plaintiff still had a valid certificate of

occupancy for the house, suggests that the ZBA departed from normal procedure and therefore

provides circumstantial evidence of retaliatory intent.  *See, e.g.*, *Powell v. City of Pittsfield*, 221

F. Supp. 2d 119, 143 (D. Mass. 2002) (that plaintiff's superior ignored guidelines requiring

submission of plaintiff's case to intermediate review board before plaintiff was denied

reinstatement was circumstantial evidence of retaliatory motive).

That the ZBA treated Plaintiff differently than other variance applicants also serves as

circumstantial evidence of retaliatory motive.  *See, e.g.*, *Econ. Opportunity Comm'n of Nassau*

*Cnty., Inc. v. Cnty. of Nassau*, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000) ("[A] plaintiff can also

show retaliatory intent by establishing unequal treatment . . . ."); *Hous. Works, Inc. v. City of*

*N.Y.*, 72 F. Supp. 2d 402, 424 (S.D.N.Y. 1999) ("Evidence that defendants acted toward plaintiff

disparately from the manner in which defendants acted toward others may serve as

circumstantial evidence of retaliation."), *appeal dismissed*, 203 F.3d 176 (2d Cir. 2000); *accord Sumner v. U.S.P.S.*, 899 F.2d 203, 209 (2d Cir. 1990); *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987); *Grant v. Bethlehem Steel*, 622 F.2d 43, 46 (2d Cir. 1980).  For example, Raymond and Dawna Chase, who also resided in the Village, sought to construct a screened and covered patio extending from the rear of their house and, like Plaintiff, were mid-construction when they were ordered to stop and apply to the ZBA for the proper setback variances.  (Sussman Aff. Ex. 81; Davignon Aff. Ex. W.)  The ZBA in 1995 granted the variances on the conditions that the patio extend no closer than three feet from the property line and that a gutter be installed to control rain runoff.  (Sussman Aff. Ex. 81.)  Five years later, the Chases applied for variances to build another addition to the rear of the property, which the ZBA unconditionally granted.  (*Id.*)  It did not, as it did with Plaintiff, condition the variance on the removal of any external structures to compensate for setback variances.  Village resident Michael Depompeis was also in the process of performing renovations to a building he owned when, in 2010, he applied to ZBA for variances necessary to complete the work.  (Davignon Aff. Ex. Y.)  In Depompeis's case, as in Plaintiff's, the ZBA expressed concern that the residents would use the attic area as habitable space.  (*Id.*)  The ZBA granted Depompeis's variance on the conditions that Depompeis not use the attic as habitable space and that he comply with all local and state codes, (*id.*); the ZBA did not, as it did with Plaintiff, impose conditions prohibiting Depompeis from insulating the attic or building steps leading up to it.  While these applications cannot be said to be identical to Plaintiff's—there are obvious differences in, among other things, the nature of the proposed construction and the extent of the variances requested—they nonetheless demonstrate that when faced with reasonably similar variance requests, the ZBA imposed far less onerous conditions than it did on Plaintiff's variances.  Moreover, when Frink was asked during

his deposition if there were any other variances that the ZBA conditioned on a resident vacating until obtaining a certificate of occupancy, he indicated that although there may have been one other instance, he did not think so.  (Frink Dep. at 105–06.)  This provides further circumstantial evidence of retaliatory motive.  *See, e.g.*, *Hous. Works*, 72 F. Supp. 2d at 424–25 (that defendant city reevaluated other organizations' applications for city program when they raised fiscal red flags, but refused to reevaluate plaintiff organization's application under similar circumstances, served as circumstantial evidence that city had retaliated against plaintiff in response to its protests and lawsuits).

Finally, where, as here, there is evidence that the defendant engaged in an "ongoing course of adverse action" against the plaintiff, such action may serve as additional evidence of retaliatory intent.  *Women's Interart Ctr.*, 2005 WL 1241919, at *28; *see, e.g.*, *Econ. Opportunity Comm'n*, 106 F. Supp. 2d at 437 ("[A] plaintiff can also show retaliatory intent by establishing . . . an ongoing campaign of adverse action."); *Hous. Works*, 72 F. Supp. 2d at 426 ("Evidence of a 'pattern of antagonism' or of prior retaliatory conduct may serve as circumstantial evidence of retaliation."); *cf. Gagliardi*, 18 F.3d at 195 (motive adequately alleged by evidence that Village repeatedly refused plaintiffs' requests to enforce zoning codes and ordinances over 9-year period).  Here, Plaintiff paints a picture of conduct following the March 2005 state court ruling by which the ZBA impeded her from both obtaining a new building permit and occupying her house.  From March 2005 through the ZBA's allegedly retaliatory action in 2008, the ZBA denied each variance application that Plaintiff submitted.  Indeed, Plaintiff sought variances from Village zoning ordinances regarding lot coverage, front-yard setback, and side-yard setback in August 2006, March 2007, and May 2007, and each application

was summarily dismissed.[21]  (Pl.'s 56.1 ¶¶ 59–60, 76, 83; Sussman Aff. Exs. 27, 37, 41.)  The record also demonstrates that as Plaintiff continued to apply for variances, the ZBA imposed upon Plaintiff additional—and seemingly increasingly unreasonable—procedural requirements. For example, in April 2007, Frink advised Plaintiff that she might need to apply for variances other than the ones she requested in order to proceed with construction, but that the ZBA would not inform her which additional variances were necessary.  (Pl.'s 56.1 ¶ 77; Sussman Aff. Ex. 38.)  Similarly, at the June 2007 ZBA meeting, Frink claimed that Plaintiff needed to appeal the then–building inspector's determination that her house contained more than 2.5 stories, (Pl.'s 56.1 ¶ 86; Sussman Aff. Ex. 44, at 4–5), when in fact Plaintiff had already supplemented her previous variance application seeking a variance as to the number of stories, (Sussman Aff. Ex. 43).  Also at the June 2007 ZBA meeting, Frink noted that Plaintiff had not yet taken steps to ensure that the house was structurally sound, (Pl.'s 56.1 ¶ 88; Sussman Aff. Ex. 44, at 6), but Plaintiff was prohibited from doing so because the Village had denied her a building permit to perform the necessary work.  When viewed against the backdrop of the conduct described above, this ongoing course of action provides circumstantial evidence of retaliatory motive sufficient to create a fact issue for trial.  *See, e.g.*, *Hous. Works*, 72 F. Supp. 2d at 426–30 (city's pattern of antagonism toward plaintiff organization—including failing to rule on its administrative appeal and award it state contract—combined with city's awareness of protected activity and disparate treatment of plaintiff "circumstantially established retaliatory intent").[22]

---

[21]      As indicated above, the ZBA did grant Plaintiff a variance pertaining to the size of her lot in September 2006, but without being granted the remaining variances, Plaintiff was unable to proceed with construction on her house.

[22]      The court in *Housing Works, Inc. v. City of New York* also found that the temporal proximity of the challenged action to the protected activity contributed to the circumstantial evidence weighing in favor of retaliatory motive.  72 F. Supp. 2d at 422–24.  The fact that the

## III.   CONCLUSION

For the reasons stated above, Plaintiff's claims for violations of her substantive due process and equal protection rights, as well as her claim against Fenton for First Amendment retaliation are hereby DISMISSED with prejudice.  Plaintiff's sole remaining claim is for First Amendment retaliation against the ZBA.  Defendants' Motion for Summary Judgment is therefore GRANTED IN PART and DENIED IN PART.  The Clerk of the Court is respectfully directed to terminate the pending motion.  (Doc. 27.)  The parties are directed to appear before this Court for a pre-trial conference on Friday, August 5, 2011, at 11 a.m.

**SO ORDERED.**

Dated: July 6 , 2011
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

ZBA's 2008 decision was several years removed from Plaintiff's 2004 state-court challenge, however, is not dispositive.  As this court has held, "the absence of close temporal proximity of the protected activity to the adverse action is not necessarily fatal, because evidence of an ongoing pattern of retaliatory conduct and intent can . . . establish a causal connection" sufficient to withstand a summary judgment motion.  *Rolon v. Ward*, No. 05-0168, 2008 WL 4700705, at *24 n.23 (S.D.N.Y. Oct. 24, 2008) (internal quotation marks omitted).  Here, the ZBA's departures from procedure, its disparate treatment of Plaintiff as compared to other variance applicants, and its pattern of antagonism toward Plaintiff provide sufficient circumstantial evidence to raise a triable issue of fact.

29